* * * * * * * * * * *
The Full Commission reviewed the prior Opinion and Award, based upon the record of the proceedings before the Deputy Commissioner and the briefs and oral argument before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence or rehear the parties or their representatives; accordingly, the Full Commission affirms, with modifications, the Opinion and Award of the Deputy Commissioner.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Commission and the Commission has jurisdiction of the parties and the subject matter.
2. At all times relevant to this claim, an employer-employee relationship existed between plaintiff and defendant-employer.
3. Defendant-employer is insured by Underwriters Safety and Claims.
4. Defendant has denied liability and plaintiff has not received any workers' compensation disability benefits. Defendant has not paid for any medical treatment.
5. The Industrial Commission shall determine the average weekly wage based on the Form 22 submitted by the parties.
6. Documents stipulated into evidence include the following:
a. Stipulated Exhibit Number 1, Pre-Trial Agreement;
 b. Stipulated Exhibit Number 2, Medical Records and Bills;
 c. Stipulated Exhibit Number 3, Form 22 Statement of Days Worked and Earnings of Injured Employee; and
 d. Stipulated Exhibit Number 4, Industrial Commission Forms
 * * * * * * * * * * *
Based upon all the competent evidence of record, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff had worked for defendant-employer for approximately 21 years and was still employed by defendant-employer.
2. Defendant-employer is a manufacturer that produces rubber belts. For the majority of time that plaintiff worked for defendant-employer, he worked in the curing department on an assembly line with a partner. Plaintiff also worked in the "work cell" department of defendant-employer for approximately five months.
3. Prior to May 24, 2004, plaintiff did not have any significant health problems that would have prevented him from performing his work.
4. According to the Plant Manager, Frank Delgado, employees in the curing department rotate weekly among four workstations or cells. Typically, employees work an eight-hour shift with three fifteen-minute breaks. Fifteen minutes before the end of the shift, the employees stop working in the cell and clean their work area.
5. Plaintiff worked in the curing department for the majority of his 21 years of employment with defendant-employer. Plaintiff's job involves grabbing an uncured tube with his right hand from a spinning roller and pulling the tube towards him. This is done while standing. Each tube is about 46 inches long and weighs approximately five pounds. Next, plaintiff grips an air hose with his left hand and places the tube on top of a mandrel that is in his right hand. Using a foot pedal, plaintiff forces air into the mandrel, which causes the tube to slide into the mandrel and separate from the mandrel as well. Plaintiff also uses a quick flipping motion with his wrist to prevent the tube from sticking to the mandrel.
6. Once the tube is separated from the mandrel, plaintiff retrieves another tube from a table to his left. With the left hand, plaintiff spreads the tube open with his fingers while covering the top of the tube with his right hand to prevent the air pressure from escaping. The air pressure allows the tube to slide over the mandrel. Plaintiff lifts the mandrel with both hands and puts it in the machine to be "cooked." The average weight of the mandrel is about 15 to 20 pounds.
7. After the mandrel is cooked, plaintiff lifts the mandrel with both hands and puts it on a roller. Plaintiff twists the mandrel while placing it on the spinning roller to prevent the mandrel from being ejected from the roll. While spinning, the tube is wrapped with cloth material. Plaintiff controls the spinning of the roll with a foot pedal. To meet the daily quota, plaintiff does not completely stop the roller before placing each tube into the roller. After the tube is wrapped, plaintiff removes it from the roller with his hands and places it on the stand in front of him. Plaintiff continuously repeats his cycle of duties until his shift is complete. Plaintiff is required to use repetitive hand movements to complete his duties in the curing department.
8. The production quota is 200 tubes per shift when there are two people working together. The expected load is reduced to 135-140 tubes with just one person working in a cell. Generally, employees reach their production quota.
9. At the hearing before the Deputy Commissioner, Kenneth Norwood, another employee for defendant-employer who had worked in the curing department for five years, testified. Mr. Norwood corroborated plaintiff's description of the job duties in the curing department. In 2000, Mr. Norwood was diagnosed with carpal tunnel syndrome and defendants accepted Mr. Norwood's claim as compensable.
10. For approximately five months prior to May 24, 2004, plaintiff worked in the work cell department. The job duties in the work cell department are lighter than the duties required in the curing department. As a work cell operator, plaintiff would lay a tube flat and use the foot pedal to automatically move the mandrel into the tube. The mandrel then would automatically grind the tube. After plaintiff removed the tube from the mandrel, he would stripe the length of the tube with either one or two stripes depending on the requirement.
11. On May 24, 2004, while reaching for a mandrel, plaintiff felt pain in his right hand. Plaintiff immediately reported his right hand pain to Oyster Mercer, his supervisor. Mr. Mercer prepared an accident report and assigned plaintiff to light duty work for the rest of his shift.
12. During the weekend following the onset of his right hand pain, plaintiff iced his hand. He also began experiencing numbness and tingling in both of his hands. Plaintiff returned to work as scheduled on Monday and reported continued right hand pain and numbness and tingling in both hands. Again, plaintiff was assigned to light duty work for the Monday shift. By Monday evening, the pain was radiating from the hands into his arms, with more severe pain in the left hand. At this point, plaintiff sought medical treatment at the Emergency Room
13. At the Emergency Room, pain medication was prescribed and plaintiff was referred to his family physician for further evaluation. The Emergency Room physician released plaintiff from work for six weeks.
14. Following the advice of the Emergency Room physician, plaintiff presented to his family physician, Janice Stump. After evaluating plaintiff, Dr. Stump suspected carpal tunnel syndrome as a possible diagnosis. Dr. Stump prescribed two braces for plaintiff to wear on each hand and referred him to a board certified orthopaedist, J. TH. Bloem, for further evaluation.
15. On June 10, 2004, plaintiff presented to Dr. Bloem. Plaintiff reported continuing pain and discomfort in the hand beginning May 24, 2004. Dr. Bloem diagnosed left hand sprain and bilateral carpal tunnel syndrome. Dr. Bloem performed a local pressure test, Tinel and Phalen's tests, and a nerve conduction study, which confirmed his diagnosis. Initially, Dr. Bloem prescribed physical therapy, prescription pain medication and released plaintiff from work for two weeks. As of June 24, 2004, plaintiff's symptoms had not improved, so his out of work restrictions were continued through July 15, 2004.
16. On July 7, 2004, plaintiff requested that Dr. Bloem allow him to return to work. Consequently, Dr. Bloem released plaintiff to light duty, non-repetitive work with both hands. Plaintiff remained on light duty, non-repetitive work from July 7, 2004, through February 2, 2005. In light of the fact that conservative treatment was not improving plaintiff's symptoms, Dr. Bloem performed carpal tunnel release on plaintiff's left hand on February 2, 2005. Carpal tunnel release of the right hand was performed on March 23, 2005. Dr. Bloem restricted plaintiff to light non-repetitive work with the left wrist, with no work involving the right wrist. Defendants were unable to accommodate plaintiff's work restrictions following his bilateral release surgeries. On May 6, 2005, Dr. Bloem released plaintiff to return to his normal work beginning May 9, 2005.
17. William T. McClure, an ergonomics expert with 15 years of experience in the area of hand rehabilitation and ergonomic studies, filmed a video of plaintiff's job duties as a curing operator and work cell operator for defendant-employer. In 2004, Mr. McClure performed 147 work task analysis studies similar to the study he performed in this claim. Mr. McClure discussed plaintiff's job duties with Bonnie Gay in Human Resources; the Plant Manager, Frank Delgado, and the employees performing the duties on the videotape. Mr. McClure did not discuss the job duties with plaintiff nor did he actually observe plaintiff perform his duties in the curing or work cell departments. In evaluating plaintiff's job duties, Mr. McClure reviewed approximately five cycles. In attempting to measure the amount of force applied by the hand to insert and remove the tubes as required by the curing operator position, Mr. McClure found he was unable to master this task. Mr. McClure noted the technique needed is one that curing operators have learned and practiced over time. The video also does not accurately reflect the pace at which plaintiff is expected to perform his duties to reach the production quota of 200 tubes per shift.
18. As a result of his ergonomic job analysis performed on October 18, 2004, Mr. McClure ultimately concluded that plaintiff's duties in the curing department and work cell department did not increase plaintiff's risk of contracting bilateral carpal tunnel syndrome. The Full Commission finds that, while Mr. McClure is qualified to evaluate and assess jobs from an ergonomic standpoint, it assigns greater weight to Dr. Bloem's expert medical opinion regarding the causation of plaintiff's bilateral carpal tunnel syndrome.
19. Dr. George S. Edwards, a board certified orthopaedist, reviewed plaintiff's medical records and the ergonomic report and videotape prepared by Mr. McClure. Dr. Edwards opined that to a reasonable degree of medical certainty, plaintiff's job duties did not cause his bilateral carpal tunnel syndrome nor did his job duties place him at a greater risk of suffering from carpal tunnel syndrome. Dr. Edwards, however, never examined plaintiff.
20. Dr. Bloem treated plaintiff over a period of approximately seven months for his bilateral carpal tunnel syndrome. Dr. Bloem was provided an accurate description of plaintiff's job duties, which remained constant over 21 years. Dr. Bloem considered the other causes of carpal tunnel syndrome such as having diabetes, or having thyroid or kidney disease and discounted them as possibilities in the present case. Further, Dr. Bloem had an opportunity to review an ergonomic work task analysis drafted by Mr. McClure and the expert medical opinion of Dr. Edwards' regarding the causation and the increased risk of plaintiff developing bilateral carpal tunnel syndrome from his job duties. Neither the study nor Dr. Edwards' expert medical opinion altered Dr. Bloem's opinion. Dr. Bloem opined that plaintiff's problems with bilateral carpal tunnel syndrome were caused by his occupational exposure to repetitive work with his hands. Dr. Bloem further opined that plaintiff's job duties in the curing department for 21 years placed him at an increased risk of developing bilateral carpal tunnel syndrome. The opinions of Dr. Bloem on causation and increased risk are given greater weight than those of Dr. Edwards.
21. Plaintiff has proven by the greater weight of the evidence that he developed an occupational disease, bilateral carpal tunnel syndrome, as a result of his employment with defendant-employer, and that his employment with defendant-employer placed him at an increased risk for acquiring and developing bilateral carpal tunnel syndrome as compared to members of the general public.
22. As a result of his occupational disease, plaintiff was disabled and unable to work from May 25, 2004, until July 7, 2004, and from February 3, 2005, until May 9, 2005, when Dr. Bloem released plaintiff to return to his normal work.
23. The Form 22 Wage Chart provided by defendants and stipulated by the parties indicates plaintiff's average weekly wage is $539.14, yielding a weekly compensation rate of $359.44.
24. At the hearing before the Deputy Commissioner, Bonnie Gay, a human resources representative for defendant-employer, testified. Ms. Gay stated that plaintiff had received short-term disability benefits pursuant to defendant-employer's plan for the time he was out of work in the amount of $2,029.00. In his testimony at the hearing before the Deputy Commissioner, plaintiff confirmed that he had received the short-term disability benefits. However, no evidence was introduced at the hearing before the Deputy Commissioner to indicate whether defendant-employer's short-term disability plan was entirely funded by defendant-employer. The Full Commission finds the defendants are not entitled to a credit for disability payments made to plaintiff.
 * * * * * * * * * * *
Based upon the foregoing Stipulations and Findings of Fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff bears the burden of proving each element of compensability in order to prove the existence of an occupational disease within the meaning of N.C. Gen. Stat. § 97-53(13). This requires plaintiff to show that (1) the disease must be characteristic of a trade or occupation; (2) the disease must not be an ordinary disease of life to which the public is equally exposed outside of the employment; and (3) there must be proof of causation. Hansel v. Sherman Textiles, 304 N.C. 44,283 S.E.2d 101(1981). In the instant case, plaintiff has carried the burden of proof to establish that he contracted the occupational disease of bilateral carpal tunnel syndrome as a direct result of his employment with defendant-employer, that his job duties significantly contributed to his development of the occupational disease and that his employment with defendant-employer placed him at an increased risk of developing these conditions compared to the general public. N.C. Gen. Stat. § 97-53(13).
2. As a result of plaintiff's occupational disease, defendants shall pay plaintiff temporary total disability compensation at the compensation rate of $359.44 per week from May 25, 2004, through July 7, 2004 and from February 3, 2005, through May 9, 2005. N.C. Gen. Stat. § 97-29.
3. Defendants shall pay all medical expenses incurred or to be incurred by plaintiff for treatment of his bilateral carpal tunnel syndrome for so long as such examinations, evaluations and treatments may reasonably be required to effect a cure, give relief or lessen plaintiff's period of disability. N.C. Gen. Stat. §§ 97-2(19) and 97-25.
 * * * * * * * * * * *
Based upon the foregoing Stipulations, Findings of Fact and Conclusions of Law, the Full Commission enters the following:
 AWARD
1. Subject to an attorney's fee approved herein, defendants shall pay to plaintiff temporary total disability compensation at the rate of $359.44 per week from May 25, 2004, through July 7, 2004, and from February 3, 2005, through May 9, 2005. Compensation due that has accrued shall be paid in a lump sum to plaintiff, subject to the attorney's fee awarded herein.
2. Defendants shall pay all medical expenses incurred and to be incurred as a result of plaintiff's bilateral carpal tunnel syndrome, for so long as such evaluations, treatments and examinations may reasonably be required to effect a cure, give relief and/or lessen plaintiff's period of disability.
3. An attorney's fee of twenty-five percent (25%) of the compensation due plaintiff under Paragraph 1 of this Award is hereby approved for plaintiff's counsel. Twenty-five percent (25%) of the lump sum due plaintiff shall be deducted therefrom and paid directly to plaintiff's attorney.
4. Defendants shall pay the costs of this action.
This the __ day of May 2006.
 S/_____________ PAMELA T. YOUNG COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER